CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

March 05, 2024

LAURA A. AUSTIN, CLERK
BY:
        s/A. Beeson
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **BENJAMIN CARTER,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:20-cv-00713** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **JOSEPH ELY, <u>et</u> <u>al.,</u>** | ) | **Chief United States District Judge** |
| **Defendants.** | ) | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Benjamin Carter, a Virginia inmate who is now proceeding <u>pro</u> <u>se</u>, filed this civil action under 42 U.S.C. § 1983 against multiple individuals employed at Red Onion State Prison ("Red Onion") and Wallens Ridge State Prison ("Wallens Ridge"). After Carter's retained counsel withdrew from the case, Carter filed a fifth amended complaint asserting violations of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.[1] The case is presently before the court on Carter's motion for summary judgment on his claims against defendant Joseph Ely, ECF No. 213, and a motion for partial summary judgment filed by Ely and fourteen other individuals represented by the Office of the Attorney General, ECF No. 241.[2] For the reasons set forth below, the motions for summary judgment are **DENIED**.

---

[1] Carter seeks to recover damages against the named correctional officials in their individual capacities. Although Carter also asserted claims under state law against the Commonwealth of Virginia, those claims were summarily dismissed on January 13, 2023. <u>See</u> Order, ECF No. 180, at 2.

[2] Defendant James Lambert is also represented by the Office of the Attorney General. However, Lambert expressly declined to move for summary judgment. <u>See</u> Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 1 n.1.

## Background

The series of events giving rise to this action began in May 2020 when Carter was incarcerated at Red Onion, a maximum-security facility operated by the Virginia Department of Corrections ("VDOC"). Carter claims that defendants Eric Miller, S. Sisco, C. Messer, Shannon Hayes, Tyler Bray, Michael Williams, Christopher Wampler, Robert Gibson, Michael Mullins, James Mullins, Gregory Ridings, Franklin Cooper, and Jeff Kiser used or allowed others to use excessive force against him on May 19, 2020, after Carter "punched" defendant James Lambert for allegedly threatening him and "calling him a 'stupid n****r.'"[3] 5th Am. Compl., ECF No. 181, at 5. Carter claims that Nurse McCoy refused to treat his injuries after he was taken to the medical unit, and he claims that the actions of Miller, Messer, Sisco, Lambert, and Kiser were taken in retaliation for having filed informal complaints regarding his housing conditions at Red Onion.

Later that same day, Carter was moved to Wallens Ridge. Carter claims that, upon his arrival, defendant Christopher King used excessive force against him in retaliation for attacking Lambert and that King also threatened to harm him if he voiced any complaints. Carter remained in the restrictive housing unit ("RHU") at Wallens Ridge for over six months—from May 19, 2020, until November 24, 2020, when he was transferred back to Red Onion. He claims that his conditions of confinement in the RHU were unconstitutional, that

---

[3] Lambert has filed counterclaims of assault and battery against Carter. Lambert alleges that Carter, "without warning or provocation, . . . began to strike [him] in the face, causing [him] to fall back against a wall and lose consciousness." Counterclaim, ECF No. 203, at 7. Lambert further alleges that he suffered multiple facial fractures as a result of the physical attack, including a fracture of the orbital bone below an eye socket. Id. Lambert ultimately underwent surgery, "which included the installation of a metal plate on the side of his face and below his eye." Id. Carter has filed a separate motion for summary judgment on the counterclaims asserted by Lambert. See ECF No. 252. That motion will be addressed separately.

defendant Joseph Ely kept him in solitary confinement in retaliation for complaining about his living conditions, and that Ely deprived him of his right to procedural due process.

Carter has moved for summary judgment on his claims against Ely, and the defendants have moved for summary judgment on some of Carter's claims. The court will discuss the facts relevant to the claims at issue in the discussion section below.

## Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). In considering each motion, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (quotation marks omitted). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251–52.

<u>Discussion</u>

## I.      Exhaustion of Administrative Remedies

The defendants have moved for summary judgment with respect to certain claims on the basis that Carter failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). The PLRA provides that "[n]o action shall be brought" in federal court by an inmate challenging prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002), and that "proper exhaustion" is required, which includes "compliance with an agency's deadlines and other critical rules," <u>Woodford v. Ngo</u>, 548 U.S. 81, 90 (2006). The Supreme Court has also concluded that "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007).

Although the PLRA's exhaustion requirement is "strict," it "does not operate as an absolute bar to prison litigation in federal court." <u>Griffin v. Bryant</u>, 56 F.4th 328, 335 (4th Cir. 2022). Instead, "it sets forth a built-in exception, specifying that a prisoner need not exhaust remedies if they are not available." <u>Id.</u> (internal quotation marks omitted) (citing <u>Ross v. Blake</u>, 578 U.S. 632, 635–36 (2016)). In other words, if "an administrative remedy, although officially on the books, is not capable of use to obtain relief," the exhaustion requirement "does not

4

come into play." <u>Ross</u>, 578 U.S. at 643.  The Supreme Court has identified three circumstances in which an administrative grievance procedure is not "capable of use" in this sense: (1) where the procedure "operates as a simple dead end," with correctional officials "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the procedure is "so opaque" that it is "practically . . . incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) where correctional officials "thwart inmates from taking advantage of a grievance procedure through machination, misrepresentation, or intimidation." <u>Id.</u> at 643–44.

### A.     VDOC Grievance Procedure

VDOC Operating Procedure ("OP") 866.1, titled "Offender Grievance Procedure," is the mechanism used to resolve most complaints and grievances from inmates incarcerated in VDOC facilities. <u>See</u> OP 866.1, eff. July 1, 2016, Vilbrandt Aff. Encl. A, ECF No. 242-1. Grievable matters include "[p]rocedures of the facility, region, division, and department which affect the grievant personally"; "[a]ctions of individual employees . . . which affect the grievant personally"; "[r]eprisals against the grievant for filing a grievance or grievance appeal"; and "[a]ny other matters relating to conditions of care or supervision . . . which affect the grievant personally." OP 866.1(IV)(M).

Pursuant to OP 866.1, inmates must first make a good faith effort to resolve their issue informally through the procedures available at the institution. OP 866.1(V)(A). Generally, this may be accomplished by submitting a written informal complaint to the grievance department, which is then forwarded to the appropriate staff for investigation and a response. <u>Id.</u> The response should be provided within 15 calendar days. OP 866.1(V)(B).

If an inmate does not receive a timely response to the initial complaint, or if the inmate is dissatisfied with the response, the inmate may submit a regular grievance. OP 866.1(V)(A)(3); see also OP 866.1(VI) (describing the regular grievance procedure). Subject to certain exceptions, a regular grievance must be submitted within 30 calendar days from the date of the incident or the discovery of the incident. OP 866.1(VI)(A). An exception to the 30-day rule applies when an inmate submits a grievance complaining of sexual abuse. Id. The policy states that "[t]here is no time limit on when an offender may submit a grievance regarding an allegation of sexual abuse" but that "[o]therwise-applicable time limits shall apply to any portion of a grievance that does not allege an incident of sexual abuse."[4] Id.

"There are three possible levels of review for regular grievances." OP 866.1(VI)(C). The Warden or "Facility Unit Head" is responsible for providing a Level I response within 30 calendar days. OP 866.1(VI)(C). A dissatisfied inmate may appeal to Level II, where the appeal is reviewed by the Regional Administrator, the Health Services Director, or the Chief of Operations for Offender Management Services. Id. For most issues, Level II is the final level of review. OP 866.1 explains that an inmate satisfies the requirements for exhausting administrative remedies when a regular grievance has been appealed through the highest eligible level of review without a satisfactory resolution of the issue. OP 866.1(IV)(O).

---

[4] The exception applicable to allegations of sexual abuse is consistent with federal regulations promulgated pursuant to the Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301 et seq. "Congress enacted PREA with the purpose of implementing standards and policies to prevent prison rape and to 'protect the Eighth Amendment rights of Federal, State, and local prisoners.'" Doe v. Snyder, 945 F.3d 951, 955–56 (6th Cir. 2019) (quoting 34 U.S.C. § 30302). Although "PREA generally left intact the PLRA's exhaustion requirement, . . . regulations promulgated pursuant to PREA modified one aspect of exhaustion." Id. The regulations provide that an "agency shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse." 28 C.F.R. § 115.52(b)(1).

**B.      Exhaustion of Claims that Accrued on May 19, 2020, at Red Onion**

The operative complaint asserts claims of excessive force, retaliation, and deliberate indifference based on actions that allegedly occurred at Red Onion on May 19, 2020. Carter alleges that after he punched Lambert in the face, he was "punched in the back of the head"; "shoved down to the floor"; "punched, kicked, [and] kneed in the head, face, back, and neck on camera in handcuffs placed behind his back non-resisting"; and "viciously beaten for approximately 3 [and] 1/2 minutes." 5th Am. Compl., ECF No. 181, at 5–6. He alleges that the following defendants aided and/or participated in the initial beatings: Eric Miller, S. Sisco, C. Messer, Shannon Hayes, Tyler Bray, Michael Williams, Christopher Wampler, Robert Gibson, Michael Mullins, James Mullins, Gregory Ridings, and Franklin Cooper. Id. at 6. Carter alleges that one of the officers made a sexual statement to him while he was being escorted to the medical unit and that he was physically and sexually assaulted in the medical unit. See id. at 7 ("[O]ne defendant put his crotch in Carter's face and said 'you like that dick, don't you?' While in the medical unit, [Carter's] testicles were squeezed [and] kneed and he was punched by defendants repeatedly in the head, back, face, neck, and torso, and was sodomized by a defendant's finger."). Carter alleges that Warden Jeff Kiser subsequently entered the medical unit and threatened to kill him if he made any complaints. Id. at 15. Carter alleges that his face was bleeding heavily when he arrived in the medical unit and that Nurse McCoy "watched [him] bleed out and gave him no medical treatment." Id. at 8. He further alleges that he was placed in five-point restraints in the medical unit; that the restraints were excessively tight and cut into his wrists; that Gregory Ridings smeared mace on his wounds while he was in five-point restraints; and that he remained in the overly tight restraints for

eight hours while "suffering great pains, choking, coughing, and burning from the mace on his open cuts." Id. at 8–9. He also alleges that the threatening and abusive actions of Kiser, Miller, Messer, Sisco, and Lambert were taken in retaliation for having filed informal complaints on May 14, 2020, and May 17, 2020, "concerning his housing at [Red Onion]." Id. at 3.

On July 1, 2020, Carter executed a sworn statement averring that an officer at Wallens Ridge had threatened to harm him if he complained about the actions that occurred at Red Onion on May 19, 2020. See Pl.'s Decl., ECF No. 1-1 at 1. According to the declaration, after being moved to Wallens Ridge and placed in cell D-103 on May 19, 2020, "Officer Blair threatened to beat [Carter] if [he] was to even speak to anybody [at Wallens Ridge] about the excessive force [at] Red Onion State Prison earlier that day." Id.

Several months later, Carter submitted a regular grievance alleging that he had been physically beaten and sexually assaulted at Red Onion on May 19, 2020. See Vilbrandt Aff. Encl. B, ECF No. 242-1 at 22. The grievance indicates that it was signed by Carter on November 21, 2020, and that Red Onion received the grievance on December 7, 2020. Id. The grievance included the following information:

> I was sexually assaulted and beaten in handcuffs and shackles on Red Onion State Prison (ROSP) on May 19, 2020 at 10 am by multiple unknown officers. Due to COVID-19 all officers had on mask[s]. I was beaten on the floor of [the housing unit] in full restraints, again on the boulevard and told to "suck the officers dick" as I was bending down forward from the force on my arms and the officer stuck the crotch area of his pants forcibly on my forehead as he made the sexual statement. I was sexually assaulted again at the medical support building entrance and that officer said "you like that dick don't you?" and grabbed my head that time and shoved his crotch area in my face forcibly and while the officers punched me. Once inside the medical station, I was

> kneed from behind in my balls, and punched by multiple officers
> while one of them squeezed my balls excessively [too] tight and
> stuck his finger in my anus through my boxers and I yelled for
> help, when another officer stuck some [item] too far in my ear so
> hard my [consciousness] was in and out. I was [taken] to med.
> bed #1, stripped to my boxers, where I [laid] in my urine and
> anus sore and balls for hours and was threatened into silence or
> else I would get killed. I'm scared to say much about it.

Id. Carter requested to be seen by an "outside mental health and medical professional." Id. He asserted that he was suffering from increasingly severe testicular pain and experiencing "flashbacks of being [sexually assaulted] again," and that prison medical professionals had refused to help him. Id.

The record reflects that the regular grievance was treated as a complaint under the Prison Rape Elimination Act. See Vilbrandt Aff. Encl. B, ECF No. 242-1 at 21 ("In your grievance, you allege PREA."). In a Level I response dated December 17, 2020, Red Onion Assistant Warden S. Fuller deemed the grievance "[u]nsubstantiated at this time." Id. Carter appealed the Level I response to the Regional Administrator. Id. In a Level II response dated February 5, 2021, the Regional Administrator upheld the Level I response and informed Carter that "Level II is the last level of appeal for this grievance." Vilbrandt Aff. Encl. B, ECF No. 242-1 at 20.

### 1.    Allegations of Sexual Assault

In the memorandum filed in support of their pending motion for summary judgment, the defendants concede that Carter "did exhaust the issue pertaining to him being allegedly sexually assaulted by correctional officers." Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 7; see also id. at 9 ("This sexual assault was in fact grieved by Plaintiff."). Nonetheless, in the section of their brief titled "Failure to Exhaust Administrative Remedies," the defendants

argue that "the grievance paperwork . . . referred to 'multiple unknown officers'" and that "no defendants were named as to this allegation of excessive force." Id. at 5, 9.

To the extent that the defendants seek summary judgment on the basis that Carter's grievance did not identify the particular defendants who sexually assaulted him, the defendants' argument is without merit. The defendants do not cite to any portion of the grievance policy that requires inmates to name particular officials in order to properly exhaust administrative remedies, and the Supreme Court has held that the PLRA does not impose such a requirement. See Jones, 549 U.S. at 219 (concluding that "exhaustion is not per se inadequate simply because an individual later sued was not named in the grievances"). Accordingly, the defendants' motion will be denied insofar as it seeks summary judgment on the basis that Carter failed to properly exhaust his allegations of sexual assault.[5]

### 2.    Other Allegations of Mistreatment

The defendants argue that Carter did not properly exhaust any of his other claims of alleged mistreatment at Red Onion on May 19, 2020. The defendants maintain that Carter

---

[5] The defendants alternatively appear to suggest that the failure to identify which officer(s) sexually assaulted Carter is a pleading deficiency. See Defs.' Mem. Supp. Summ. J., ECF No. 242, at 9. While the defendants correctly note that a plaintiff is required to "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009), the operative complaint satisfies this requirement with respect to Carter's claims of excessive force. Carter alleges that he was physically and sexually assaulted on May 19, 2020, after punching Lambert, and he identifies the officers who participated or aided in the use of excessive force. See 5th Am. Compl., ECF No. 181, at 6. The fact that he does not identify which defendant(s) sexually assaulted him is not fatal to his claims of excessive force against the named officers. See Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002) (rejecting "the argument that the force administered by each defendant in [a] collective beating must be analyzed separately to determine which of the defendants' blows, if any, used excessive force," and noting that an officer can be held liable if he actively participates in the use of excessive force or "is present at the scene and . . . fails to take reasonable steps to protect the victim of another officer's use of excessive force"); Williams v. Atkins, 333 F. Supp. 2d 209, 213–14 (S.D.N.Y. 2004) (rejecting a similar argument and noting that "it is unfair to say that because a plaintiff, who was handcuffed, pinned face down and sprayed in the face with pepper spray, cannot identify which of the two officers struck him, therefore the defendants should be granted summary judgment").

"filed no grievances alleging that he was subject to retaliation for filing informal complaints about his housing situation"; that he did not file any grievance paperwork complaining of being physically beaten by officers after punching Lambert; that he did not properly grieve Warden Kiser's alleged threat to kill him if he voiced complaints; that he did not file any grievance paperwork complaining about the application of five-point restraints in the medical unit or the use of mace while restrained; and that he did not file any grievance paperwork alleging that he was denied medical treatment for his obvious injuries. Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 7–10.

The defendants' argument appears to be based, at least in part, on the 30-day deadline that generally applies to inmate grievances. See Vilbrandt Decl., ECF No. 242-1, at ¶ 6 ("Grievances are to be submitted within 30 calendar days from the date of the incident."). Although the grievance quoted above included allegations of being "beaten . . . in full restraints," "punched by multiple officers," and threatened with death on May 19, 2020, it was not filed within the 30-day period described in the grievance policy. Additionally, there is no evidence that Carter filed any other grievances complaining of being subjected to excessive force, retaliation, or deliberate indifference to serious medical needs at Red Onion on May 19, 2020.

Nonetheless, even assuming that Carter did not properly exhaust his administrative remedies with respect to these other claims, the court concludes that the defendants are not entitled to summary judgment on their exhaustion defense. As explained above, inmates are only required to exhaust "available" administrative remedies, 42 U.S.C. § 1997e(a), and there is evidence in the record from which a reasonable factfinder could conclude that prisoner

officials "thwart[ed]" Carter from properly grieving his claims of excessive force, retaliation, and deliberate indifference by threatening to harm him if he complained about what occurred at Red Onion on May 19, 2020. Ross, 578 U.S. at 644; see also Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."). In the operative complaint, Carter alleges under penalty of perjury that Warden Kiser entered the medical unit on May 19, 2020, and threatened to kill him if he voiced any complaints. Carter also submitted a sworn statement averring that an officer at Wallens Ridge threatened to harm him if he spoke to anyone about what occurred at Red Onion on May 19, 2020. Although Carter eventually filed a regular grievance several months later that complained of being physically and sexually assaulted at Red Onion, Carter also reported that he was "threatened into silence or else [he] would get killed" and that he was "scared" to provide additional information. Vilbrandt Decl. Encl. B., ECF No. 242-1 at 22.

The defendants have not addressed Carter's sworn assertions of being threatened with death or serious bodily harm if he complained about the incidents that allegedly occurred at Red Onion on May 19, 2020. Viewing the record in the light most favorable to Carter, the court concludes that a reasonable factfinder could conclude that prison officials made "threats . . . that would deter a reasonable inmate from pursuing a grievance process" and that Carter himself was deterred by the threats. Moss v. Harwood, 19 F.4th 614, 623 (4th Cir. 2021). Because a genuine issue of material fact exists as to whether the grievance procedure was actually "available" for Carter to properly exhaust his claims of excessive physical force,

retaliation, and deliberate indifference against Red Onion officials, the defendants' motion for summary judgment will be denied with respect to these claims.[6]

### C.      Exhaustion of Claims against Defendant King

Carter asserts claims of excessive force and retaliation against Christopher King, an officer who worked at Wallens Ridge on May 19, 2020. He claims that King immediately assaulted him after he arrived at Wallens Ridge. 5th Am. Compl. at 9–10. He alleges that King opened the back door, stood on his thigh, squeezed his left eyebrow until it bled, and threatened to harm him if he voiced any complaints. Id. Carter further alleges that he "did as [he] was told by King in fear for [his] life." Id. at 10.

The defendants have moved for summary judgment on the claims against King on the basis that Carter failed to exhaust his administrative remedies. According to the defendants' evidence, Carter "filed no grievance paperwork as to any assault or threats by Major King." Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 11 (citing Ravizee Aff., ECF No. 242-2, at ¶ 12).

In response to the defendants' motion, Carter argues that he "had no 'available' remedy" against King as a result of King's threats. Pl.'s Resp. Opp'n Summ. J., ECF No. 251, at 5. Carter asserts, under penalty of perjury, that "King threatened to 'assault' [him] again and possibly 'kill [him]' if [he] made any complaints." Id. As a result of King's threats, Carter contends that he "was scared to file a complaint against [King] while still at [Wallens Ridge]." Id. Carter further asserts that upon being transferred back to Red Onion in November 2020,

---

[6] The defendants did not move for summary judgment on the merits of these claims. The defendants previously acknowledged that the claims of excessive force could not be decided on summary judgment and should be set for trial. See Defs.' Mem. Supp. Previous Mot. Summ. J., ECF No. 111, at 7.

he discovered that King had moved to that facility. Id. Thus, Carter contends that "[t]he only hope of 'remedy' [he] had [against King] at that time, and now, . . . was to file suit" against King. Id.

Based on Carter's sworn statements, the court concludes that a reasonable factfinder could conclude that Carter was thwarted from filing any grievances against King as a result of King's threats to harm him. Ross, 578 U.S. at 644. Consequently, the defendants' motion for summary judgment will be denied with respect to the claims against King.[7]

### D.   Exhaustion of Claims against Defendant Ely

Carter asserts claims under the First, Eighth, and Fourteenth Amendments against Joseph Ely, a Unit Manager at Wallens Ridge, arising from his confinement in the RHU for over six months. Carter alleges that Ely kept him in solitary confinement as a form of "abusive corporal punishment" in retaliation for complaining about his living conditions. 5th Am. Compl., ECF No. 181, at 13–14.  Carter further alleges that he was deprived of necessities such as showers and exercise while housed in solitary confinement and that Ely failed to provide him with procedural due process during his period of confinement. Id. According to Carter, Ely told him that it was Ely's decision to confine Carter in the RHU, that Carter had "hurt his friend," and that Carter would never be released from the unit. Id. at 13.

On October 19, 2020, Carter signed a regular grievance alleging that he had been confined in the RHU "for over 150 days" as a form of retaliatory "punishment," that he was being denied the "privileges" to which he was entitled, and that he had not received "fair due

---

[7] The defendants did not move for summary judgment on the merits of the allegations against King. The defendants previously acknowledged that the claim of excessive force could not be decided on summary judgment and should be set for trial. See Defs.' Mem. Supp. Previous Mot. Summ. J., ECF No. 111, at 7.

process" in accordance with VDOC policy. Ravizee Aff. Encl. B, ECF No. 242-2 at 23. Carter attached an Institutional Classification Authority ("ICA") report showing that Ely had recommended that Carter remain in the restrictive housing unit following an October 15, 2020, ICA hearing and that Ely had also approved that recommendation. Id., ECF No. 242-2 at 24. On November 4, 2020, the Warden at Wallens Ridge determined that Carter's grievance was "founded" and that Ely had violated the applicable VDOC procedure by "serv[ing] as the ICA and the administrative Reviewer." Id., ECF No. 242-2 at 21. Therefore, the Warden ordered that Carter receive another ICA hearing. Id. Carter appealed the Level I response to the Regional Administrator, thereby exhausting his administrative remedies with respect to the October 19, 2020, grievance. Id., ECF No. 242-2 at 20.

In the memorandum filed in support of their pending motion for summary judgment, the defendants concede that Carter "did exhaust" his claim of being held in solitary confinement for an extended period as a form of retaliation, and they contend that "this claim should proceed to a trial." Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 7. The defendants acknowledge that Carter exhausted his claim of being denied due process in connection with the ICA hearing held on October 15, 2020, but they argue that his procedural due process claim fails on the merits. Id. at 14. To the extent that Carter claims that his conditions of confinement in the restrictive housing unit violated the Eighth Amendment, the defendants argue that Carter "filed no grievance paperwork" regarding his conditions of confinement at Wallens Ridge "except for the extended period of confinement" in the RHU. Id. at 11. The defendants appear to suggest that the Eighth Amendment claim against Ely should be dismissed for failure to exhaust.

Having reviewed the relevant grievance paperwork, the court finds the defendants' exhaustion argument unpersuasive. [8] To satisfy the PLRA's exhaustion requirement, a grievance must "be sufficient to alert the prison to the nature of the wrong for which redress is sought." Wilcox v. Brown, 877 F.3d 161, 167 n. 4 (4th Cir. 2017) (internal quotation marks and brackets omitted). Carter's October 2020 grievance alleged that he had been held in the restrictive housing unit for over 150 days as a form of retaliatory punishment and that he was being denied the privileges to which he was entitled. The court concludes that Carter's allegations were sufficient to put prison officials on notice that he was challenging the conditions, including the duration, of his confinement in the restrictive housing unit at Wallens Ridge. Because it is undisputed that Carter pursued the October 19, 2020, grievance to the highest level of administrative review, the defendants' motion for summary judgment will be denied with respect to the Eighth Amendment claim asserted against Ely.

## II.     The Merits of the Constitutional Claims against Ely

Carter has filed a motion for summary judgment on the merits of his constitutional claims against Ely in which he incorporates the arguments raised in connection with a previous motion that Ely opposed.  See Pl.'s Mem. Supp. M. Summ. J., ECF No. 213-1 (incorporating the arguments set forth in ECF No. 95); Def. Ely's Resp. Opp'n, ECF No. 112 (opposing the motion filed at ECF No. 95). The defendants have only moved for summary judgment on the merits of the due process claim asserted against Ely. The court will address each claim in turn.

---

[8] The defendants have not moved for summary judgment on the merits of the Eighth Amendment claim asserted against Ely. They have previously argued that triable issues of fact preclude the entry of summary judgment on the merits of this claim. See Defs.' Mem. Supp. Previous M. Summ. J., ECF No. 111, at 8.

### A.    Eighth Amendment Claim

Carter claims that Ely violated the Eighth Amendment by confining him in the RHU at Wallens Ridge for over six months. He asserts under penalty of perjury that he was "subjected to a roughly 70 sq. ft. cell" with "[n]o human stimuli" for "22-24 hours [per day]"; that he received "no out of cell activities other than approx[imately] 4 times"; that he received "only 3 showers per week and none on the weekends"; that he was granted "no visitation (contact or non-contact)"; and that he was not allowed to have a television, personal clothing, or personal property while housed in the RHU. Pl.'s Mem. Supp. M. Summ. J., ECF No. 213-1, at 1–2. He also alleges that his cell door had "metal strips" that prevented him from communicating with nearby inmates and that the only form of outdoor recreation he received occurred no more than three times per week in a "steel cage alone [with] no outside recreational equipment." Pl.'s Mem. Supp. Previous Mot. Summ. J., ECF No. 95, at 5–6. Carter further asserts that he did not cause any "disruptions" or "threats" to the orderly operation of the facility during his term of confinement at Wallens Ridge. Pl.'s Mem. Supp. M. Summ. J., ECF No. 213-2, at 2.

In response to Carter's allegations, the defendants submitted an affidavit executed by J. Carico, the Chief of Housing and Programs at Wallens Ridge. See Carico Aff., ECF No. 111-2. Carico asserts that Carter was transferred from general population at Red Onion to the RHU at Wallens Ridge on May 19, 2020, after assaulting Correctional Officer Lambert, "due to the violent nature of the assault, for Carter's safety and the safety of the staff." Carico Aff. ¶ 5; see also id. ¶ 20 ("Due to the nature of the violent assault Carter committed against Lt. Lambert at [Red Onion] on May 19, 2020, an emergency situation arose. Carter could not

17

remain at [Red Onion], not only for his safety, but for the safety or prison staff. Carter was a Security Level 5 inmate, so it was imperative that he be transferred to [Wallens Ridge] as this facility is equipped to house Security Level 5 inmates . . . ."). Carico explains that the RHU is "used for special purpose bed assignments that are operated under maximum security regulations for the personal protection and/or custodial management of inmates." Id. ¶ 7. Carico asserts that Carter received 30-day status reviews in May, June, July, August, September, October, and November 2020, and that the recommendation was made that Carico remain on "RHU status" following several of those reviews. Id. ¶¶ 8–12. Carico emphasizes that Carter was charged with and convicted of assaulting a staff member at Red Onion, and he asserts that Carter "was considered a disruption/threat to the orderly operation of [Wallens Ridge]" as a result of the conviction. Id. ¶ 11. Carico further asserts that Carter "completed 3 Restrictive Housing journals" while at Wallens Ridge, and that upon being reclassified following a rehearing in November 2020, "Carter was then set to be transferred back to [Red Onion] where he could participate in the Step-Down Program." Id. ¶ 20.

Carico's affidavit also disputes some of Carter's allegations regarding the restrictions to which he was subject in the RHU. For instance, Carico asserts that Carter received "one visit per week; access to basic personal items including clean clothing and bedding and personal property specified on the appropriate Authorized Personal Property Matrix; . . . access to library books and educational services; weekly visits from treatment staff; access to religious guidance; and a minimum of 2 hours out of cell exercise 5 days per week in a supervised area." Id. ¶ 19. Carico maintains that there is no indication that Carter was denied access to any of these privileges. Id.

"The Eighth Amendment, which prohibits infliction of 'cruel and unusual punishments,' U.S. Const. amend VIII, applies to claims by prisoners against corrections officials challenging conditions of confinement." Porter v. Clarke, 923 F.3d 348, 355 (4th Cir. 2019). To establish an Eighth Amendment violation, "a prisoner must prove (1) that the deprivation of a basic human need was objectively sufficiently serious, and (2) that subjectively the officials acted with a sufficiently culpable state of mind." De'Lonta v. Johnson, 708 F.3d 520, 525 (4th 2013) (internal quotation marks and brackets omitted). "To satisfy the objective prong, . . . the deprivation must be extreme—meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of serious harm resulting from exposure to the challenged conditions." Porter, 923 F.3d at 355 (internal quotation marks and alterations omitted). "To satisfy the subjective prong in an Eighth Amendment case, a plaintiff challenging his conditions of confinement must demonstrate that prison officials acted with deliberate indifference" to an excessive risk of harm. Id. at 361 (internal quotation marks omitted).

Having reviewed the record, the court concludes that Carter is not entitled to summary judgment on his Eighth Amendment claim against Ely. As noted above, the parties have presented somewhat conflicting descriptions of the conditions of confinement in the RHU and the privileges afforded to inmates housed there. However, even if the undisputed evidence established that Carter faced a substantial risk of serious harm from the challenged conditions,[9]

---

[9] In Porter, the Fourth Circuit recognized that "prolonged isolated confinement" under restrictive conditions "creates a substantial risk of psychological and emotional harm, which risk is sufficient to satisfy the objective prong." 942 F.3d at 361; see also Thorpe v. Clarke, 37 F.4th 926, 937 (4th Cir. 2022) (discussing Porter and noting that it held that "severe isolation alone can deprive prisoners of 'the minimal civilized measure of life's necessities,' violating the Eighth Amendment") (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

a reasonable jury could find that Carter cannot satisfy the subjective prong of his Eighth Amendment claim. The United States Court of Appeals for the Fourth Circuit has explained that prison officials' "penological justification for housing . . . . inmates in conditions amounting to solitary confinement" is relevant to the subjective prong and that "a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement . . . even though such conditions create an objective risk of serious emotional and physiological harm." Porter, 923 F.3d at 362–63. "Put simply, prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective." Id. at 363. If so, "then confinement of the inmate in such conditions will not violate the Eighth Amendment." Id. at 363 n.2.

Viewing the record in the light most favorable to Ely, the court concludes that a reasonable jury could find that Carter's violent assault of a correctional officer provided a legitimate penological justification for confining Carter in the RHU for an extended period. See, e.g., Mason v. Talley, No. 1:21-cv-01118, 2023 WL 2619160, at *11 (E.D. Va. Mar. 22, 2023) (concluding that an inmate's "extensive record and history of assaulting both inmates and jail staff provide[d] a clear penological justification for the conditions of his confinement in the RHU" at a local jail). Consequently, Carter is not entitled to summary judgment on the Eighth Amendment claim asserted against Ely.

## B.  First Amendment Retaliation Claim

For similar reasons, the court concludes that Carter is not entitled to summary judgment on his claim that Ely kept him in the RHU in retaliation for complaining about his living conditions.

"The First Amendment protects the right to petition the Government for a redress of grievances, and the Supreme Court has recognized that prisoners retain this constitutional right while they are incarcerated." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) ("Martin I"). To prevail on a First Amendment retaliation claim under § 1983, a plaintiff must establish three elements: "(1) he engaged in protected activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." Id. The Fourth Circuit has held that the causation element implicates "the burden-shifting framework of the same-decision test." Shaw v. Foreman, 59 F.4th 121, 130 (4th Cir. 2023) (citing Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) ("Martin II"). "That test allocates a prima facie burden to the plaintiff to show that his protected activity was 'a substantial or motivating factor' in the defendants' action." Id. (quoting Martin II, 977 F.3d at 301). "The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action in the absence of the plaintiff's protected activity." Id. (citing Martin II, 977 F.3d at 299–300).

Here, the defendants have affirmatively denied taking any retaliatory action against Carter, and they argue that a genuine dispute of material fact exists as to whether Carter's confinement in the RHU was causally connected to activity protected by the First Amendment. See Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 3; Def. Ely's Resp. Opp'n, ECF No. 112, at 8–9. Relying on Carico's affidavit, the defendants argue that Carter was placed

21

in the RHU at Wallens Ridge after assaulting a correctional officer and that the violent nature of the assault provided a legitimate basis for Ely's decisions to recommend that Carter remain in the RHU. Viewing the record in the light most favorable to Ely, the court concludes that a reasonable jury could find that Ely would have made the same recommendations regardless of whether Carter engaged in activity protected by the First Amendment. Consequently, Carter is not entitled to summary judgment on the retaliation claim against Ely.

### C.   Due Process Claim

Both sides have moved for summary judgment on Carter's claim that he was held in solitary confinement in the RHU without receiving the procedural protections to which he was entitled. For the following reasons, the court concludes that neither side is entitled to summary judgment on the claim for denial of procedural due process.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. IV, § 1. To establish a due process violation in this context, a plaintiff must satisfy a two-part test. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020). First, he must demonstrate that he had a protected liberty interest in avoiding being housed in segregation or solitary confinement. Id. "To do so, he must be able to show two things: first, that there is a basis for an interest or expectation in state regulations for avoiding such confinement, and second, that the conditions impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Id. at 275 (alteration in original) (internal quotation marks omitted). If the plaintiff demonstrates that he had a protected liberty interest, he must then establish

that the defendant failed to provide "minimally adequate process to protect that liberty interest." Id.

Here, the parties initially dispute whether Carter's confinement in the RHU implicated a protected liberty interest. See Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 13 (asserting that Carter "did not incur any deprivation of a liberty interest"). The record reflects that inmates housed in the RHU receive ICA reviews every 30 days to determine whether they should be released from the RHU. Carico Aff., ECF No. 111-2, at ¶ 8. The defendants do not challenge whether a VDOC policy requiring 30-day reviews provides the requisite "basis for an interest or expectation in state regulations for avoiding such confinement." Smith, 964 F.3d at 275; see also Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015) (finding that a state prison policy requiring security detention reviews every 30 days created a potential liberty interest). Instead, the parties' dispute centers on whether Carter's confinement in the RHU imposed "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).

"Whether confinement conditions are atypical and substantially harsh in relation to the ordinary incidents of prison life is a necessarily . . . fact specific comparative exercise." Incumaa, 791 F.3d at 527 (alteration in original) (internal quotation marks omitted). Relying on the Supreme Court's reasoning in Wilkinson v. Austin, 545 U.S. 209 (2005), the Fourth Circuit "has construed the atypical-and-significant-hardship analysis as turning on primarily three factors: '(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence.'" Smith, 964 F.3d 266,

275 (4th Cir. 2020) (quoting Incumaa, 791 F.3d at 530). Applying those factors here, the court concludes that a genuine issue of material fact exists with respect to whether Carter's conditions of confinement in the RHU were so atypical and significantly harsh as to create a liberty interest in avoiding such confinement.

The first factor focuses on the magnitude or severity of the restrictions to which Carter was subject in the RHU. As noted above, the sworn statements submitted by the parties provide somewhat conflicting accounts of those restrictions. The conditions described in Carter's sworn statements resemble some of those that contributed to the finding of a protected liberty interest in Wilkinson, which involved a state supermax facility. For instance, like the Wilkinson plaintiffs, who "were required to remain in their cells, which measured seven-by-fourteen feet, for twenty-three hours per day," Smith, 964 F.3d at 276, Carter alleges that he was required to remain in a 70-square-foot cell for between 22 and 24 hours per day in the RHU. Carter also alleges, as the plaintiffs did in Wilkinson, that his cell door had "metal strips [to] prevent conversation or communication with other inmates" and that he was unable to participate in visitation. Wilkinson, 545 U.S. at 214; see also id. (noting that opportunities for visitation were "rare"). According to the defendants' evidence, however, Carter's cell was "well ventilated, adequately lighted, appropriately heated, and maintained in sanitary condition at all times"; he was eligible to receive "one visit per week" in addition to "weekly visits from treatment staff"; he received "no less than 3 showers per week"; he had access to library books, religious guidance, and educational services; and he received "a minimum of 2 hours out of cell exercise 5 days per week in a supervised area." Carico Aff., ECF No. 111-2, at ¶ 19.

Even if the first factor were to weigh in Carter's favor, "the severity of the conditions alone are insufficient to create a liberty interest." Smith, 964 F.3d at 277. Instead, the court must consider "the indefiniteness of solitary confinement, as well as its duration, in determining whether prisoners have a sufficient liberty interest in avoiding such requirement." Id. The defendants' evidence indicates that Carter received monthly reviews during his period of confinement in the RHU and that he was ultimately released from the RHU and transferred back to Red Onion. According to Carter, however, Ely made statements suggesting that Carter would remain in the RHU indefinitely under his watch, and Carter was not released from the RHU until he grieved the denial of adequate process and that grievance was determined to be founded.

As for the durational aspect of the second factor, Carter remained in the RHU for a total of more than six months. This period of segregated confinement is far shorter than those in previous cases that the Fourth Circuit has found sufficient to support a protected liberty interest, such as the "twenty-year period at issue in Incumaa" and the period of "four years and three months" at issue in Smith. Smith, 964 F.3d at 278 (citing Incumaa, 531 F.3d at 531). Instead, it is comparable to the six-month period at issue in Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997), in which the Fourth Circuit held that the conditions of confinement described by inmates confined in administrative segregation for six months did not implicate a liberty interest. Nonetheless, the Fourth Circuit has made clear that "prisoners need not languish in solitary confinement for decades on end in order to possess a cognizable liberty interest under the Due Process Clause of the Fourteenth Amendment," Id. at 269, and courts have recognized that periods of segregated confinement lasting less than a year may be

25

"sufficiently long to implicate a cognizable liberty interest if the conditions of confinement during that period were sufficiently severe."[10] Marion v. Columbia Corr. Inst., 559 F.3d 693, 694, 698 (7th Cir. 2009) (concluding that a term of segregation as long as 240 days required scrutiny of the actual conditions of segregation); see also Williams v. Brown, 849 F. App'x 154, 157 (7th Cir. 2021) (holding that an inmate's eight-month period of confinement in segregation was "long enough to implicate a liberty interest" where the inmate "asserted that the conditions there put his health and life at risk"); Gaines v. Stenseng, 292 F.3d 1222, 1226 (10th Cir. 2002) (remanding for consideration of the particular conditions of confinement in segregation to determine whether an inmate's 75-day placement was atypical and significant).

The third and final factor that must be considered is whether Carter's assignment to the RHU had any "collateral consequences" on his sentence. Incumaa, 964 F.3d at 530. Relying on Smith, Carter argues that this factor weighs in his favor because he was "never able to receive good-time credit past a level 4 (IV) while in segregation" at Wallens Ridge. Pl.'s Mem. Supp. Previous M. Summ J., ECF No. 95-1, at 13; see Smith, 964 F.3d at 280 (noting that VDOC inmates assigned to Level IV accrue no good-time credits and that "depriving someone of good-time credits is a collateral consequence"). However, there is conflicting evidence in the record as to whether Carter's assignment to Level IV resulted from his placement in RHU or whether other factors, such as his disciplinary history, affected his ability

---

[10] The court also notes that in its more recent decision in Incumaa, the Fourth Circuit rejected the suggestion that "the bar for proving an atypical and significant hardship is quite high in the Fourth Circuit" in light of Beverati. 791 F.3d at 531 (internal quotation marks omitted). The Fourth Circuit emphasized that the bar is "neither higher nor lower than that of the Supreme Court" and that "Beverati simply highlights a failure of proof." Id. Specifically, "[t]he Beverati inmates failed to meet their burden because the evidence showed that administrative segregation was not significantly worse than confinement in the general population." Id.

to earn good-time credits. See, e.g., Carico Aff., ECF No. 111-2, at ¶ 9 ("On July 27, 2020, the ICA conducted Carter's Annual Review and recommended that he remain assigned to GCA 4 and Security Level 5. Carter had received five (5) infractions during the year review period, including 105A for assaulting a staff member at [Red Onion].").

Based on the court's review of the record, the court concludes that the evidence is not "so one-sided that one party must prevail as a matter of law" on the issue of whether Carter's conditions of confinement in the RHU imposed an atypical and significant hardship in relation to the ordinary incidents of prison life. Anderson, 477 U.S. at 252. Consequently, to the extent that the defendants argue that the due process claim fails as matter of law because Carter was not deprived of a liberty interest, their motion for summary judgment must be denied. Likewise, because the existence of a protected liberty interest in avoiding confinement is a prerequisite to a cognizable due process claim, Smith, 964 F.3d at 274, Carter is not entitled to summary judgment.

The defendants also argue that the claim fails because Carter "was afforded all due process." Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 13. "To succeed on his procedural due process claim, [the plaintiff] must establish not only a liberty interest but also that [the defendant] failed to afford him adequate process to protect that interest." Smith, 964 F.3d at 281. The Supreme Court has explained that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate" and that "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983). Although the periodic review "need not be extensive, . . . the review must be meaningful; it cannot be a sham or a pretext." Toevs v. Reid, 685 F.3d 903, 912 (10th Cir.

2012); see also Williamson v. Stirling, 912 F.3d 154, 183 (4th Cir. 2018) (noting that the periodic reviews required under Hewitt "must be meaningful enough to take into account the 'facts relating to a particular prisoner'") (quoting Hewitt, 459 U.S. at 477 n.9).

Viewing the record in the light most favorable to Carter, a reasonable jury could find that Ely failed to afford Carter due process. Although ICA records indicate that Carter's status was reviewed on a monthly basis, it is undisputed that Ely improperly approved his own recommendation that Carter remain in the RHU. Consequently, the court concludes that a triable question exists as to whether Carter received the kind of meaningful review required by existing precedent. See Incumaa, 791 F.3d at 534 (reaching the same decision where the South Carolina Department of Corrections provided for "only a single-layered confinement review" every 30 days and the warden did not participate unless the inmate filed a grievance challenging the decision).

The defendants nonetheless argue that "any violation of due process in the form of Ely approving a decision" that he participated in making "was cured by the rehearing" that Carter received after filing a grievance in October 2019. Defs.' Mem. Supp. M. Summ. J., ECF No. 242, at 14. They maintain that "there can be no violation of due process" if a procedural defect was "cured." Id. The defendants do not cite any authority to support this argument. While the argument might have had some force if the procedural defect had not impacted the duration of Carter's confinement in the RHU, the record indicates that Carter was ultimately released from the RHU and transferred back to Red Onion following the rehearing. During the intervening period, Carter remained in segregated confinement in the RHU. As other courts have recognized, due process is not necessarily satisfied "when an inmate's protected

28

interest—for example, in avoiding prolonged confinement in segregation—is not safeguarded by the later administrative action." <u>Williams</u>, 849 F. App'x at 156; <u>see also</u> <u>Morrisette v. Peters</u>, 45 F.3d 1119, 1122 n.4 (7th Cir. 1995) (noting that in order to provide due process, "the administrative appeal must correct the procedural error before the punishment has begun"); <u>Walker v. Bates</u>, 23 F.3d 652, 658 (2d Cir. 1994) (holding that an inmate's success in the administrative appeal process did not bar his § 1983 claim for denial of due process in connection with a disciplinary hearing that resulted in him being held in solitary confinement).

For these reasons, the court concludes that triable issues of fact exist that preclude the entry of summary judgment in either party's favor on the claim for denial of procedural due process. Accordingly, the motions for summary judgment will be denied with respect to this claim.

<u>Conclusion</u>

For the reasons stated, Carter's motion for summary judgment on his claims against defendant Ely, ECF No. 213, is **DENIED**, and the defendants' motion for partial summary judgment, ECF No. 241, is **DENIED**. An appropriate order will be entered.

Entered: March 4, 2024

Michael F. Urbanski
Chief U.S. District Judge
2024.03.05 14:51:03
-05'00'

Michael F. Urbanski
Chief United States District Judge